**Arnold H. LICHTENSTEIN,**
**Plaintiff, Appellant,**

v.

**CONSOLIDATED SERVICES GROUP,**
**INC. et al., Defendants, Appellees.**

**Nos. 98–1994, 98–2086.**

United States Court of Appeals,
First Circuit.

Heard March 3, 1999.
Decided April 1, 1999.

---

Ralph A. Dyer, with whom Law Offices of Ralph A. Dyer, P.A., was on brief for appellant, cross-appellee Arnold H. Lichtenstein.

Tracy D. Hill, with whom Harold J. Friedman and Friedman, Babcock &

Gaythwaite, were on brief for appellee, cross-appellant Jonathan G. Fryer.

Robert E. Mittel, with whom Mittel, Asen, Hunter & Cary were on brief for appellee Consolidated Services Group, Inc.

Before BOUDIN, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOWNES, Senior Circuit Judge.

On or about October 1990, Arnold H. Lichtenstein, vice-president and a minority shareholder, was ousted from Consolidated Services Group, Inc. ("CSG"), a close corporation that distributed coffee and bottled water. Two obstacles stood in the path of an amicable parting of the ways: a noncompete clause contained in his employment agreement and disposal of his shares of CSG stock. Lichtenstein attempted to negotiate a settlement as to the first issue, and decided to sell his shares in CSG back to the corporation. His former colleagues took the position that because the incorporation process was never perfected, CSG did not exist. After efforts to resolve these matters failed, Lichtenstein filed suit against CSG, John Salterio, the president and majority shareholder, and others involved with CSG, alleging, *inter alia*, breach of contract and breach of fiduciary duty, and seeking dissolution of the corporation.

There are three issues before us. Lichtenstein appeals from: (1) the entry of summary judgment in favor of Jonathan G. Fryer, the lawyer who drafted the incorporation documents and served as voting trustee, on a breach of fiduciary duty claim and a breach of contract claim; and (2) the denial of attorney's fees. Fryer cross-appeals from the district court's denial of his motion seeking Rule 11 sanctions against Lichtenstein and his counsel for pursuing allegedly frivolous claims. We affirm.

## I.

The history of CSG began in late 1988 when Salterio and Lichtenstein decided to include two others, Peter E. Butera and Martin D. Keefe, in their plans to form a corporation. Prior to the decision to incorporate, Salterio and Lichtenstein had been conducting business as Consolidated Services Group.

Fryer was retained for the purpose of preparing the incorporation papers (which consisted of the Articles of Incorporation, the Corporate Formation Agreement, the Initial Employment Agreement, the Resolutions from the First Meeting of Incorporators, and the Voting Trust Agreement). These documents, executed on or about April 4, 1989, reflect that the incorporators issued shares of stock, elected officers and directors, and established a voting trust empowering Fryer to vote each person's share of corporate stock as Fryer was directed. The Initial Employment Agreement set forth the conditions of employment by the corporation, and included a restrictive covenant barring former employees of CSG from participating in "any business similar to the type of business conducted by the corporation" within a 150–mile radius for a period of three years.

Although the parties proceeded to conduct business as CSG,[1] the business's assets never were transferred to the corporation, no taxes were ever paid by CSG (instead, Salterio included the business's income on his personal income tax returns), and the officers never held a corporate meeting after the preliminary organizational session. The corporation's authority to conduct business was suspended in 1991 for failure to pay its corporate franchise tax to the state of Maine.

This appeal stems largely from the district court's treatment of certain motions related to the suit against Fryer. The facts underlying plaintiff's case against Fryer, which are undisputed, can be essentially boiled down as follows: Fryer prepared CSG's incorporation papers, and he later advised Lichtenstein that CSG considered Lichtenstein bound by the Initial Employment Agreement's non-compete clause. Once Lichtenstein expressed a desire to sell back his stock to the corporation, Fryer seemingly reversed ground and told Lichtenstein that because the incorporation of CSG was never perfected there were no shares to sell or transfer. Based on these circumstances, Lichtenstein accused Fryer of breach of contract and breach of fiduciary duty in federal court.[2] For much of the pretrial proceedings, he sought evidence of collusion between Fryer and Salterio in pilfering corporate assets and concealing wrongdoing. Despite several months of discovery, he unearthed no direct evidence of malfeasance by Fryer.

Defendants subsequently moved for summary judgment on all claims. Fryer moved for Rule 11 sanctions against Lichtenstein and his attorney. The motions were referred to a magistrate judge. After thoughtful consideration of the issues, the magistrate judge recommended that the breach of contract and fiduciary duty claims against Fryer be dismissed.[3] He reasoned that Fryer's obligation as voting trustee was contractually limited to voting the shares of stock in a manner directed by the stockholders, and that there was no evidence that Fryer breached his fiduciary duty as voting trustee. Nor, the magistrate concluded, was there any other fidu-

---

1. For example, the parties, holding themselves out as CSG, entered into a contract with New England Coffee Co., which generated approximately 80% of the corporation's income. They also used a checking account in the name of the corporation.

2. He also sued CSG, Salterio, and Butera in his individual action. Separately, he commenced a shareholder derivative action against Salterio. These cases were later consolidated.

3. The magistrate also suggested, and the district court concurred, that certain claims against the remaining defendants be rejected and that others be retained.

ciary or contractual relationship between Fryer and Lichtenstein, for Fryer never represented Lichtenstein in any capacity after the incorporation papers were drawn up.

On September 10, 1996, the district court adopted the magistrate's recommendation over Lichtenstein's objections, and entered judgment for Fryer on all claims. The surviving claims were tried before the district court in March and April of 1997. The court issued a memorandum decision and order on August 22, 1997, setting forth its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52. The court ruled, as a preliminary matter, that CSG was a valid corporation under Maine law. It went on to hold that Salterio had violated his fiduciary duty to CSG and its shareholders, but that none of the defendants breached the Initial Employment Agreement. The court ordered the corporation dissolved under Me.Rev.Stat. Ann. tit. 13–A, §§ 1115(1)(D), (E) (West 1998), because of Salterio's fraudulent conduct and misuse of corporate assets. It then appointed a receiver to complete an accounting of the business, pay creditors, and distribute the balance of the resources to the shareholders. *See Lichtenstein v. Consolidated Servs. Group, Inc.,* 978 F.Supp. 1, 21 (D.Me.1997).

As to Fryer's motion for Rule 11 sanctions, the magistrate judge had recommended that Lichtenstein's counsel be sanctioned for continuing to pursue claims against Fryer in an amended complaint after having reason to believe they were without factual basis. The magistrate found no reason to penalize Lichtenstein himself. The district court, assessing the matter *de novo* at the conclusion of the case, held that sanctions were not warranted. It refused to sanction Lichtenstein or his counsel, finding that, in light of the "suspicious" nature of the circumstances, "Fryer['s role] could have been reasonably understood, in the beginning, as one of complicity with the activities of Defendants . . . in what appears to the Court to be an effort to purloin the corporate opportunity from the Plaintiff and others."

The case was eventually settled in the main after the receiver issued a preliminary report outlining the corporate assets and recommending certain courses of action. At some point, Lichtenstein's counsel sought an order awarding attorney's fees, citing Me.Rev.Stat. Ann. tit. 13–A, § 634 (West 1998) (authorizing court to award "reasonable expenses, including attorney's fees" in a successful derivative action). The court concluded, however, that the statute, which had been enacted during the pendency of the action, did not retroactively apply to cases such as this. There being no other statutory or contractual basis for an award of attorney's fees, the motion was denied.

This appeal followed.

**II.**

The standards for summary judgment are well-settled, and need only brief mention. A district court may not grant summary judgment unless the pleadings and supporting documentation reveal no genuine issue of material fact. *See* Fed. R.Civ.P. 56(c). All reasonable inferences based on the record must be construed in the non-movant's favor. To avoid the entry of judgment, a party opposing summary disposition must come forward with reliable evidence in support of his position. Within these parameters, we determine *de novo* whether the district court was correct in rejecting the claims leveled against Fryer. *See Lennon v. Rubin,* 166 F.3d 6, 8 (1st Cir.1999).

Lichtenstein asserts that Fryer (sued solely in his capacity as trustee) was not a voting trustee with a carefully circumscribed role, but should be treated as a "controlling shareholder" with broader fiduciary responsibilities to the corporation generally, and to the minority shareholders specifically. This assertion does not survive scrutiny. There is nothing in the record to suggest that Fryer became a

shareholder in CSG; nor was Fryer ever elected as an officer or director of the company. Hence, the obligations naturally flowing from holding corporate office, *see* Me.Rev.Stat. Ann. tit. 13–A, § 716 (West 1998), do not apply to Fryer.

■ His only corporate role was to serve as voting trustee. Indeed, the CSG documents are replete with references to Fryer as the "Voting Trustee of the shares of [CSG]." More important, the Voting Trust Agreement states that "[t]he sole obligation of the Trustee shall be to cast the vote of each share of stock pursuant to the written direction of each beneficiary entitled to such share." In general, the terms of the trust agreement define the contours of a trustee's duties. *See, e.g.,* Me.Rev.Stat. Ann. tit. 18–A, § 7–302 (West 1998); Restatement (Second) of Trusts § 164, at 341 (1959) (stating general principle that "[t]he nature and extent of the duties and powers of the trustee are determined by the terms of the trust"). Against this backdrop, Lichtenstein's claim that Fryer assumed far-reaching fiduciary obligations has no merit. The provision of the Voting Trust Agreement at issue not only expressly limited the power of Fryer as a trustee, but also specifically narrowed his duty to a single act: that, when called upon, he would vote the corporate shares of "each beneficiary" as he was instructed. Fryer had no discretion in fulfilling this role, and was not invested with any other power or obligation. And while Fryer occasionally performed legal work for CSG, he acted on behalf of the corporation, and never represented Lichtenstein himself.

■ Lichtenstein makes a half-hearted attempt to suggest that the trust established by the Agreement did not satisfy the conditions of a voting trust under Maine law. If it was not a valid voting trust, Lichtenstein argues, then presumably some broader obligations were imposed upon Fryer. This effort leads nowhere. Other than asserting it to be so, he has come forward with nothing that creates an issue of fact as to the validity of the voting trust. The Voting Trust Agreement here plainly separated the voting rights of the stock from other attributes of ownership, was implemented for a specific duration, and was created assertedly for the purpose of avoiding secret voting blocs and facilitating the transparency of corporate decisionmaking. *See Delta Kappa Epsilon Theta Chapter v. Theta Chapter House Corp.,* 661 A.2d 1152, 1153 n. 2 (Me.1995) (reciting general test for voting trust); Me.Rev.Stat. Ann. tit. 13–A, § 619 (West 1998) (empowering shareholders to create voting trust). This is more than enough to establish the presumptive validity of the voting trust. Lichtenstein fails to refute this evidence or otherwise demonstrate that, despite the unmistakable language of the Voting Trust Agreement transferring to Fryer only the authority to vote stocks, the incorporators actually effected a broader delegation of ownership rights or other powers to Fryer.

Unable to establish a violation of Fryer's duty as voting trustee or an independent legal relationship with Fryer, Lichtenstein's claims necessarily fail. We will not revive them.

### III.

■ We next consider Fryer's motion for Rule 11 sanctions, reviewing the trial court's denial of the motion for abuse of discretion. *See Salois v. Dime Sav. Bank of New York,* 128 F.3d 20, 28 (1st Cir. 1997). Rule 11 permits a court to impose sanctions on a party or lawyer for advocating a frivolous position, pursuing an unfounded claim, or filing a lawsuit for some improper purpose. *See* Fed.R.Civ.P. 11(b). While a trial court's decision to impose sanctions is given considerable latitude on appeal, a court's determination is accorded "extraordinary deference" when it has decided to deny sanctions. *Salois,* 128 F.3d at 28. This zone of discretion is predicated on the understanding that trial courts are in the best position to evaluate the intricacies of a case and to reach con-

clusions about the motives of the parties and their counsel.

Although Fryer originally argued that Lichtenstein brought the action in bad faith (a contention rejected by the magistrate), he does not press that argument here. Instead, he contends that the claims were objectively frivolous, and that they certainly were shown to be "without evidentiary support" by the time of Lichtenstein's deposition. He faults two aspects of the district court's decision in refusing to invoke its Rule 11 power: that the court improperly evaluated the heft of the claims in light of the full trial record rather than as it existed at the time of the filing of the First Amended Complaint; and that the court failed sufficiently to articulate its reasons for denying the motion.

■■ Whether a litigant breaches his or her duty to conduct a reasonable inquiry into the facts and the law "depends on the objective reasonableness of the litigant's conduct under the totality of the circumstances." *Navarro–Ayala v. Nunez*, 968 F.2d 1421, 1425 (1st Cir.1992). The factors to be assessed may include "the complexity of the subject matter, the party's familiarity with it, the time available for the inquiry, and the ease (or difficulty) of access to the requisite information." *Id.*

Fryer argues that the court's frame of reference in considering this question was skewed, directing our attention to language in the court's decision indicating that it evaluated the motion in light of "all the circumstances now known" at the end of trial. Of course, claims challenged as frivolous must be viewed from the appropriate vantage point. For instance, a party who brings a suit without conducting a reasonable inquiry and based on nothing more than a prayer that helpful facts will somehow emerge, and who through sheer fortuity is rewarded for his carelessness, is nevertheless vulnerable to sanctions. *See Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1279 (3d Cir.1994) ("A shot in the dark is a sanctionable event, even if it somehow hits the mark."). In such a case, it would be improper for the court to view the strength of the case in hindsight. But that is not what happened here.

In his Memorandum Decision and Order, Judge Carter did signal that he believed he was in a superior position to assess the strength of the case after conducting the bench trial. But he also stressed that "there was a reasonable basis for [plaintiff's counsel] . . . to have been, in the beginning, suspicious of the claimed disinterestedness of Fryer in his role on behalf of Salterio." It is perfectly reasonable to say, as the district court did here, that the claims were not frivolous "at the beginning," especially given the murky facts of the case, which were so confused and "suspicious" that significant efforts were required of the court to later sort them out. Such an honest observation does not mean that the court employed the wrong frame of reference.

■ It was also entirely appropriate for the court to consider the Rule 11 motion at the conclusion of the bench trial. Courts should, and often do, defer consideration of certain kinds of sanctions motions until the end of trial to gain a full sense of the case and to avoid unnecessary delay of disposition of the case on the merits. This is a sensible practice where the thrust of the sanctions motion is that institution of the case itself was improper. *See* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1337, at 121 (2d ed.1990).

■ In all events, even when viewed at the time of the filing of the First Amended Complaint, the claims were not so patently frivolous that sanctions necessarily should have been imposed. Fryer's intermittent and arguably suspicious involvement by first asserting that the Initial Employment Agreement was enforceable and then advising that there was no corporation, coupled with the fact that the legal status of the corporation itself was in doubt throughout much of the litigation, coun-

seled in favor of the court's decision that the lawsuit against Fryer had sufficient basis. Although Fryer insists that Lichtenstein's own deposition showed that the claims against Fryer were absolutely unfounded, we take a different view. Evidence of misconduct by Fryer, if it existed, would not necessarily have been known by Lichtenstein. Moreover, in this case Lichtenstein's testimony did nothing to detract from the existence or non-existence of such evidence; during his deposition, he admitted neither to closing a blind eye to facts that would tend to exculpate Fryer nor to filing suit against Fryer for some improper reason. Hence, Lichtenstein's testimony did not demonstrate that the case against Fryer was obviously groundless or that he or his lawyer failed to conduct a reasonable inquiry into the facts before filing suit. In view of these circumstances, the trial court was well within its broad authority to refuse to impose sanctions.

Fryer's fallback argument—namely, that the court's explanations in turning down the fee request were so thin as to preclude meaningful appellate review—likewise misses the target. The district court made perfectly clear what its reasons were for denying the motion. We have never required more than that the court's rationale be apparent from the face of the record and supported by the facts. *See Anderson v. Boston Sch. Comm.*, 105 F.3d 762, 769 (1st Cir.1997). Those conditions were met here.

## IV.

One last issue remains: the matter of attorney's fees. The district court initially rebuffed the request of plaintiff's counsel because Maine law, which embraces "the American Rule," requires litigants to pay their own fees in the absence of an enforceable agreement or some statutory authorization of fee recovery. *See Goodwin v. School Admin. Dist. No. 35*, 721 A.2d 642, 646 n. 8 (Me.1998). The court held that title 13–A, § 634, which

expressly authorizes fees for stockholder derivative actions, was enacted during the course of the litigation and did not retroactively apply to this suit. Lichtenstein's counsel does not challenge that determination on appeal.

Instead, he resorts to a creative alternative: that he is entitled to fees carved out of a "common fund" achieved through settlement. This was a ground first mentioned in Lichtenstein's reply papers below, but not explicitly addressed by the district court. We consider it now.

Where a common fund is created to resolve multiple claims in derivative or class actions, certain jurisdictions have allowed fee awards to be drawn from the fund itself "to spread the burden among the entire class of persons benefitted." *Catullo v. Metzner*, 834 F.2d 1075, 1083 (1st Cir.1987); *see also In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 n. 6 (1st Cir.1995). Although Maine recently joined those states that have recognized this equitable basis for attorney's fees, *see York Ins. Group of Maine v. Van Hall*, 704 A.2d 366, 368 (Me.1997) (expressly adopting common fund doctrine), Lichtenstein's claim is undone by the fact that no common fund was ever created in this case. Each aggrieved individual reached a separate settlement, and presumably paid his lawyer's fees from his respective share of the settlement. Moreover, while Lichtenstein certainly deserves some credit for exposing the irregularities surrounding CSG, none of the usual policy considerations motivating invocation of the common fund exception—*e.g.*, preventing unjust enrichment where a large class of beneficiaries have benefitted from the labor of another's counsel—are at work here. There were few shareholders involved, each gained a measure of satisfaction, and each was represented by separate counsel. We discern no free-rider problem. *See Catullo*, 834 F.2d at 1083 ("[T]he award of fees under the common

fund doctrine presupposes a large class of beneficiaries who do not participate in the litigation."). Under the circumstances, we do not believe that Lichtenstein's attorney is entitled to fees on this equitable basis.

*Affirmed. Each party shall bear its own costs.*