# United States Court of Appeals
## For the First Circuit

No. 10-1838

CQ INTERNATIONAL CO., INC.,

Plaintiff, Appellee,

v.

ROCHEM INTERNATIONAL, INC., USA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Boudin, Circuit Judges.

Robert J. Wierenga, Kimberly K. Kefalas, Suzanne L. Wahl,
Miller, Canfield, Paddock and Stone, P.L.C., Joseph Francis Ryan,
and Lyne, Woodworth & Evarts LLP, on brief for appellant.
Herbert S. Cohen, on brief for appellee.

October 3, 2011

**TORRUELLA, <u>Circuit Judge</u>**.  In this appeal from an order in a diversity suit, Rochem International, Inc., USA ("Rochem") challenges the district court's denial of its motion for sanctions under Rule 11 of the Federal Rules of Civil Procedure ("Rule 11") against CQ International Co., Inc. ("CQ").[1]  <u>See</u> <u>CQ Int'l Co.</u> v. <u>Rochem Int'l, Inc., USA</u>, No. 08cv10142-NG, 2010 U.S. Dist. LEXIS 55372, 2010 WL 2292162 (D. Mass. June 7, 2010).  Specifically, Rochem avers that, although the district court granted summary judgment in its favor, the court's failure to impose sanctions on CQ constituted an abuse of discretion in light of CQ's allegedly frivolous lawsuit against Rochem and CQ's purportedly frivolous arguments in opposing Rochem's motion for summary judgment.  For the reasons stated below, we find that the district court did not abuse its discretion in denying the imposition of sanctions on CQ and thus affirm the appealed order.

## I.  Factual Background

Although the facts and procedural history in this highly contentious case are extensive, we provide a brief sketch of only the events most relevant to this appeal.

---

[1]  Although Rochem moved for sanctions in the district court pursuant to both Rule 11 and 28 U.S.C. § 1927, it only presses on appeal for sanctions under Rule 11.  We limit our analysis accordingly.

CQ and Rochem are direct competitors in the business of importing and distributing pharmaceutical ingredients manufactured in China.

In 2000, CQ entered into an exclusive distribution agreement (the "CQ-Huizhou Contract") with Guangdong Huizhou Dongjiang Pharmaceutical Factory ("Huizhou Predecessor"), whereby CQ acquired exclusive sales rights in the U.S. market for Huizhou Predecessor's Clozapine[2] drug and became Huizhou Predecessor's exclusive agent in regulatory matters with the United States Food and Drug Administration ("FDA") concerning this drug. Under this contract, CQ agreed to "buy Clozapine exclusively from [Huizhou Predecessor], [and] not from any other Chinese or foreign manufacturer." By its terms, the CQ-Huizhou Contract became effective immediately after it was signed by the parties in 2000, had a duration of ten years, could not be cancelled without both parties' written consent, and was "binding upon each party's successors and assigns."

In April 2004, the Chinese government auctioned off a majority of Huizhou Predecessor's assets. Although CQ participated in the auction, it was unsuccessful in acquiring the assets of Huizhou Predecessor, which were instead acquired by a Chinese

_____

[2] Clozapine is an antipsychotic medication used to treat the symptoms of schizophrenia. PubMed Health, Clozapine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000893/ (last revised May 16, 2011).

-3-

individual named Qiu Huazhou who continued Huizhou Predecessor's business under the new name Huizhou Dongjiang Pharmaceutical Co., Ltd. ("Huizhou Successor"). In the action underlying this appeal, CQ alleged that the CQ-Huizhou Contract survived this auction and bound Huizhou Successor. Rochem, however, argued to the contrary, noting that certain alleged requirements for the assignment of the CQ-Huizhou Contract were not met. Specifically, Rochem noted that the auction proposal required that the auction winner -- Qui Huazhou -- pay Huizhou Predecessor a deposit of 2 million yuan RMB, which amount was to be refunded by CQ to the auction winner "upon execution . . . of a product distribution succession contract." It is undisputed that Qui never paid the deposit to Huizhou Predecessor and that Huizhou Successor and CQ never executed a "product distribution succession contract." The district court nevertheless found -- based on the language of the auction proposal and CQ-Huizhou Contract, along with public policy considerations -- that the CQ-Huizhou Contract survived the auction and became binding on Huizhou Successor.

After the auction, CQ continued to purchase Clozapine from Huizhou Successor and sold it to Ivax Pharmaceuticals ("Ivax"), a U.S. corporation and CQ's sole Clozapine customer. CQ alleges that, at some point in 2004, Ivax requested that CQ obtain

<u>micronized</u>[3] Clozapine on its behalf.  CQ, however, was unable to obtain <u>micronized</u> Clozapine from Huizhou Successor, because the latter did not have the capacity to provide <u>micronized</u> Clozapine and was unwilling to invest in the necessary micronizing equipment and facilities.

Subsequently, in February 2005, CQ entered into another exclusive distribution agreement (the "CQ-SJ/YH Contract") with two other Chinese pharmaceutical manufacturers, Wuhan Shiji Jingmao Corp. ("SJ") and Wuhan Yanhuang Chemical Co., Ltd. ("YH"), whereby CQ became "the exclusive distributor and spokesman in the American market for the Clozapine manufactured by SJ and YH" and agreed to "act as the exclusive agent for SJ and YH in matters relating to the FDA" concerning the drug Clozapine.  This contract provides, <u>inter alia</u>, as follows: "CQ shall have Clozapine produced exclusively at the factories of SJ and YH; it cannot purchase Clozapine from any other Chinese or foreign manufacturers."  The CQ-SJ/YH Contract became effective in February 2005 and had a duration of twenty years.  CQ maintains that it entered into this contract because it believed that, unlike Huizhou Successor, SJ and YH would be able to provide it with <u>micronized</u> Clozapine.  However, CQ has never purchased any Clozapine (micronized or non-micronized) from SJ and YH under this contract.

---

[3]  "<u>Micronized</u> Clozapine" refers to Clozapine that has been finely grounded with special equipment.

CQ ordered Clozapine from Huizhou Successor for the last time in May 2005. Thereafter, from the fall of 2005 through the spring of 2006, Huizhou Successor contacted CQ representatives via telephone approximately five times to inquire whether CQ was planning to purchase Clozapine. Yet, no purchases of Clozapine materialized.

Around April 2006, Rochem contacted Huizhou Successor to explore the possibility of purchasing Clozapine from it, offering Huizhou Successor a higher price for its Clozapine than CQ had previously paid. In addition, Rochem obtained from Huizhou Successor a copy of the CQ-Huizhou Contract and investigated whether such contract precluded Huizhou Successor from selling Clozapine to Rochem. Rochem alleges that during this investigation it learned that CQ had not purchased Clozapine in nearly a year, that CQ owed Huizhou Successor money, and that CQ was not answering Huizhou Successor's e-mails or telephone calls. Furthermore, Rochem's President, Robyn Frisch, maintains that Qui Huazhou, Huizhou Successor's owner, personally informed her that Huizhou Successor was free to do business with Rochem. CQ, on the other hand, contests the thoroughness of this investigation and its conclusion that Huizhou Successor was not precluded from selling Clozapine to Rochem.

Although Rochem and Huizhou Successor were unable to agree on an exclusive distribution agreement, Rochem purchased

Clozapine from Huizhou Successor on three occasions in 2006, with the last of these purchases occurring in August 2006. Rochem, in turn, sold this Clozapine to Ivax. Rochem made its last sale to Ivax in December 2006.

CQ alleges that, prior to filing its complaint in the action underlying this appeal, it was informed by an employee of Huizhou Successor, Mr. Fang Zhigang, that Huizhou Successor had met with Rochem and provided the latter with a copy of the CQ-Huizhou Contract. According to CQ, Mr. Zhigang also informed it that Rochem had purchased Clozapine from Huizhou Successor for sale to Ivax. CQ maintains that it later confirmed -- through conversations with the President of Ivax, Mr. Don Marchione -- that Rochem had purchased Clozapine from Huizhou Successor for sale to Ivax.

## II. **Procedural History**

In January 2008, CQ filed a complaint in the district court against Rochem seeking damages for the latter's purported intentional tortious interference with the CQ-Huizhou Contract. The complaint also included various other derivative claims that were dependent on the tortious interference claim and could not survive if such claim failed.

In June 2008, Rochem moved to dismiss the case for failure to state a claim upon which relief could be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

After opposition by CQ, the district court denied dismissal, ruling that CQ had alleged sufficient facts to state a claim for intentional interference with performance of contract.

Thereafter, in September 2009, after the close of a prolonged and highly litigious discovery period, the district court attempted to foster settlement discussions by ordering CQ to make a written settlement offer by October 16, 2009. Although CQ complied, it demanded $675,000, the full amount of the damages claimed in its amended initial disclosures. Rochem responded by rejecting this offer and making a counter-offer demanding that CQ pay Rochem $444,444.44 in order to settle the case and avoid Rochem's filing of a motion for sanctions and a suit for malicious prosecution. The district court noted, after being apprised of this matter by CQ, that the peculiar amount in Rochem's offer was due to the fact that the number four is considered an unlucky number in Chinese culture because it is homophonous with the Chinese word for death. The district court opined that, while Rochem's counter-offer was not a death threat, its attorneys had acted improperly. The court, however, declined to impose sanctions on Rochem's attorneys.

In October 2009, Rochem moved for summary judgment on all claims, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. After the parties filed various responsive motions, the district court scheduled a hearing for January 20, 2010 regarding

Rochem's summary judgment motion and requested supplementary briefing on various aspects of the CQ-SJ/YH Contract and its effect on CQ's claim that Rochem tortiously interfered with the CQ-Huizhou Contract. Both parties filed supplemental memoranda. CQ's memorandum, which CQ filed on the eve of the hearing (i.e., January 19, 2010), was accompanied by additional declarations from its President, Joan Chen, and its Chinese advisor, Chen Hongyi. These supplemental declarations attempted, inter alia, to substantiate a claim first made by CQ in its earlier opposition to summary judgment: specifically, that the CQ-Huizhou Contract only involved non-micronized Clozapine, whereas the CQ-SJ/YH Contract solely contemplated micronized Clozapine. Rochem moved to strike these additional declarations as untimely.

Thereafter, on January 20, 2010, Rochem moved for sanctions against CQ under Rule 11 and 28 U.S.C. § 1927 and CQ responded by requesting that the district court instead sanction Rochem.

Finally, on June 7, 2010, the district court granted summary judgment in favor of Rochem, concluding that, although the CQ-Huizhou Contract survived the auction and bound Huizhou Successor, CQ breached said contract by entering into the CQ-SJ/YH Contract, which the court considered incompatible with CQ's obligations under the CQ-Huizhou Contract. The court determined that CQ's breach of the CQ-Huizhou Contract caused Huizhou

Successor to be discharged from its obligation to sell Clozapine exclusively to CQ. In addition, the court concluded that CQ was not harmed by Rochem's purchases from Huizhou Successor because CQ could not have purchased Clozapine from Huizhou Successor without breaching the CQ-SJ/YH Contract. In reaching its decision, the district court ruled that CQ's additional declarations (from Joan Chen and Chen Hongyi) were stricken from the record as untimely, pursuant to Federal Rule of Civil Procedure 56(e)(2) and Local Rule 7.1(b)(2). See Fed. R. Civ. P. 56(e)(2); LR, D. Mass. 7.1(b)(2) ("Affidavits and other documents setting forth or evidencing facts on which the opposition is based shall be filed with the opposition."). The court, however, made clear that its conclusions would not have changed even if the additional declarations had been admitted as evidence. Additionally, the court declined to impose sanctions on either party, concluding that "CQ's claims, although belatedly and insufficiently developed, were not frivolous." CQ Int'l Co., 2010 WL 2292162, at *17.

Rochem now appeals the district court's denial of sanctions against CQ.[4]

### III. **Standard of Review**

We review for abuse of discretion all aspects of the district court's determination on Rochem's motion for sanctions

---

[4] CQ did not appeal the district court's summary judgment against it.

under Rule 11. See Nyer v. Winterthur Int'l, 290 F.3d 456, 460 (1st Cir. 2002); Lichtenstein v. Consol. Servs. Grp., Inc., 173 F.3d 17, 22 (1st Cir. 1999); see also Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990) ("[A]n appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's Rule 11 determination."). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Cooter & Gell, 496 U.S. at 405. Furthermore, while we afford a district court considerable latitude in reviewing its positive actions to impose sanctions, we accord "extraordinary deference" when, as here, it has decided to deny sanctions. Lichtenstein, 173 F.3d at 22 (quoting Salois v. Dime Sav. Bank of N.Y., 128 F.3d 20, 28 (1st Cir. 1997)); Anderson v. Boston Sch. Comm., 105 F.3d 762, 768 (1st Cir. 1997). "This zone of discretion is predicated on the understanding that trial courts are in the best position to evaluate the intricacies of a case and to reach conclusions about the motives of the parties and their counsel." Lichtenstein, 173 F.3d at 22-23.

## IV. Discussion

Rochem challenges the district court's denial of sanctions against CQ on two grounds. First, Rochem asserts that the district court clearly erred in determining that CQ's claims were not frivolous. To this effect, Rochem argues that CQ

-11-

presented frivolous arguments and declarations in its opposition to summary judgment regarding the SJ/YH Contract and Rochem's compliance with FDA regulations. In addition, Rochem argues that CQ failed to reasonably investigate its claims and knew prior to filing suit that its claims were not well grounded in fact. Second, Rochem alleges that the district court abused its discretion by failing to adequately lay out its rationale for rejecting Rochem's motion for sanctions under Rule 11.

For the reasons stated below and taking into consideration the "extraordinary deference" accorded to the district court in denying sanctions, we find that CQ's claims were not so patently frivolous that sanctions necessarily should have been imposed. See id. at 22-23. In addition, we find that the district court sufficiently provided its rationale for denying sanctions. We further discuss these findings in order.

## A. CQ's claims were not patently frivolous

Rule 11 permits a court to impose sanctions on a party or lawyer for advocating a frivolous position, pursuing an unfounded claim, or filing a lawsuit for some improper purpose. See Fed. R. Civ. P. 11(b). We have noted, however, that this Rule "is not a strict liability provision, and a showing of at least culpable carelessness is required before a violation of the Rule can be found." Citibank Global Mkts., Inc. v. Santana, 573 F.3d 17, 32 (1st Cir. 2009) (alteration omitted) (citations and internal

quotation marks omitted).  In addition, it is clear that "[t]he mere fact that a claim ultimately proves unavailing, without more, cannot support the imposition of Rule 11 sanctions."  Protective Life Ins. Co. v. Dignity Viatical Settlement Partners, L.P., 171 F.3d 52, 58 (1st Cir. 1999).

In the present case, Rochem avers that CQ violated Rule 11 by (1) presenting frivolous arguments in its opposition to summary judgment concerning the SJ/YH Contract and Rochem's compliance with FDA regulations, and (2) failing to conduct a reasonable inquiry into the law and facts underlying its tortious interference claim prior to filing the complaint.  We address these arguments seriatim.

### 1.  CQ's opposition to summary judgment

Rochem maintains that the district court clearly erred in determining that CQ's claim -- that Rochem tortiously interfered with the CQ-Huizhou Contract -- was not frivolous, particularly in light of the district court's conclusions on summary judgment regarding the merits of this claim.  As previously mentioned, the district court concluded that CQ breached the CQ-Huizhou Contract by entering into an inconsistent distribution agreement with SJ and YH (i.e, the CQ-SJ/YH Contract) before Rochem made the challenged purchases, and that CQ was not harmed by Rochem's purchases because CQ could not have purchased Clozapine from Huizhou Successor without breaching the CQ-SJ/YH Contract.  Significantly, these

-13-

conclusions were premised on the district court's finding that -- contrary to CQ's contention -- both the CQ-Huizhou Contract and the CQ-SJ/YH Contract embraced all forms of Clozapine (micronized and non-micronized) and were therefore inconsistent.

Thus, whether or not CQ's tortious interference claim was frivolous depends in large part on the reasonableness of its contention -- first presented in its opposition to summary judgment -- that the CQ-Huizhou Contract involved only <u>non-micronized</u> Clozapine, whereas the CQ-SJ/YH Contract contemplated solely <u>micronized</u> Clozapine. CQ pointed to various pieces of extrinsic evidence in support of this distinction, despite the fact that the contracts' apparently unambiguous language made no such limitation. For example, Rochem presented evidence suggesting that (1) both Huizhou Predecessor and Huizhou Successor lacked the capacity to manufacture <u>micronized</u> Clozapine and never acquired the necessary micronizing equipment, (2) the only Clozapine that CQ purchased from either Huizhou Predecessor or Huizhou Successor was the <u>non-micronized</u> variety, and (3) CQ only contracted with SJ and YH after Ivax requested <u>micronized</u> Clozapine, which CQ knew Huizhou Successor could not produce. In addition, CQ argued that the fact that both the CQ-Huizhou Contract and the CQ-SJ/YH Contract included only one price term demonstrated that the contracts did not cover both <u>micronized</u> and <u>non-micronized</u> Clozapine because

-14-

_micronized_ Clozapine was more desirable and demanded a higher price.

The district court noted that CQ's argument presented "interesting questions regarding the weight that a court should afford to extrinsic evidence when interpreting a contractual term that appears unambiguous on its face." CQ Int'l Co., 2010 WL 2292162, at *11. After considering the extrinsic evidence presented by CQ,[5] the district court concluded that this evidence was "not sufficient to create a genuine issue as to the meaning of the term 'Clozapine' in the two contracts," id. at *15, and made clear that its conclusion would not have changed even if the court had considered the stricken additional declarations (from Joan Chen and Chen Hongyi) submitted by CQ on the eve of the summary judgment hearing.[6] The court therefore granted summary judgment in favor of Rochem, but found that CQ's claims were not frivolous.

_____

[5] The district court found that Massachusetts' codification of the Uniform Commercial Code allowed the court to consider the extrinsic evidence, which it found could potentially fit as extrinsic evidence of the parties' "course of dealing" or "course of performance." See Mass. Gen. Laws Ann. ch. 106, § 2-202(a). Rochem has not alleged that the district court erred as a matter of law in considering this extrinsic evidence for purposes of interpreting an apparently unambiguous contract term. Accordingly, we assume without deciding that no error was made in this regard.

[6] In reaching its decision, the district court noted that, even if the stricken additional declarations had been admitted, CQ's tortious interference claim failed, inter alia, because CQ had presented no admissible evidence that SJ and YH's corporate leaders understood the term "Clozapine" in the CQ-SJ/YH Contract to refer only to _micronized_ Clozapine.

After examining the evidence in the record under the abuse of discretion standard of review, especially the aforementioned evidence presented by CQ concerning the meaning of the term "Clozapine" in the contracts, we conclude that CQ's contentions in opposing summary judgment, although unpersuasive, were not so patently frivolous that sanctions necessarily should have been imposed. CQ presented sufficient evidence for us to conclude that the district court did not abuse its discretion in denying the imposition of sanctions. The mere fact that CQ's arguments proved unavailing does not necessarily mandate the imposition of Rule 11 sanctions. See <u>Additive Controls & Measurement Sys., Inc.</u> v. <u>Flowdata, Inc.</u>, 96 F.3d 1390, 1398 (Fed. Cir. 1996) ("In virtually every case, an appellate court finds one party's arguments and authorities unpersuasive, but that is not remotely sufficient to make the losing party's conduct sanctionable."). Having found no legal error or clear factual error, we accord extraordinary deference to the district court's decision not to impose sanctions. See <u>Lichtenstein</u>, 173 F.3d at 22-23.

Rochem, however, also contends that CQ violated Rule 11 by presenting in its opposition to summary judgment certain allegedly irrelevant and factually unsupported accusations that Rochem violated FDA regulations. In particular, Rochem makes reference to CQ's allegations that Rochem deliberately

-16-

misrepresented the specifications of the Clozapine it sold to Ivax by providing the latter with altered certificates of analysis. CQ first presented these allegations in its opposition to summary judgment in an alternate attempt to establish one of the four elements required to prove its tortious interference claim (specifically, that defendant Rochem's alleged interference with the CQ-Huizhou Contract, "in addition to being intentional, was improper in motives or means").[7] The district court did not address these allegations in its opinion because, as an initial matter, it found that CQ failed to prove another required element (i.e., that it "was harmed by [Rochem]'s actions"). In other words, because the district court found that CQ was not harmed by Rochem's actions, the court expressly declined to "reach the issue of whether, assuming that CQ was not already in breach of its contract with Huizhou Successor, Rochem intentionally and improperly induced Huizhou Successor [through improper means] to break the contract." CQ Int'l Co., 2010 WL 2292162, at *9. Thus, the district court did not -- and was not required to -- ascertain the reasonableness of CQ's legal and factual contentions concerning

---

[7] To prevail on a claim of tortious interference with a contract under Massachusetts law, a plaintiff must establish that "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." G.S. Enters., Inc. v. Falmouth Marine, Inc., 571 N.E.2d 1363, 1369 (Mass. 1991).

-17-

the "improper means" prong of its tortious interference claim (including CQ's allegations that Rochem violated FDA regulations). Rochem nevertheless invites us to analyze for the first time on appeal (or to remand to the district court for further analysis) the reasonableness of CQ's allegations -- that Rochem violated FDA regulations -- and conclude that they were frivolous. As discussed below, we decline to embark on such a slippery slope.

Certainly, Rule 11 should be used in appropriate cases to further its central purpose: deter baseless filings. See 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1334, at 542 (3d ed. 2004) ("[T]he purpose of Rule 11 is to deter, not to compensate or to punish, although the three purposes obviously overlap and in many situations all will be served by a particular sanction."). However, we must not lose sight of the fact that a related goal of Rule 11 is to "streamline the administration and procedure of the federal courts." Cooter & Gell, 496 U.S. at 393. This tool and the sanctions it allows a district court to impose are intended to facilitate case management, not to increase caseload by requiring a district court to analyze the reasonableness of legal and factual contentions that it would otherwise not have to ascertain. We will not invite full-scale satellite litigation in the area of sanctions, nor will we require district courts to spend valuable judicial resources in punctiliously analyzing the reasonableness of each and every legal

-18-

and factual contention made by a party where, as here, such analysis is not necessary to resolve the merits of the central claim in dispute.  Accordingly, we find that the district court's decision not to address the reasonableness of Rochem's argument -- that CQ frivolously accused Rochem of violating FDA regulations -- and to deny sanctions on this ground did not constitute an abuse of discretion.

## 2.  CQ's inquiry prior to filing the complaint

Rochem also argues that CQ should be sanctioned under Rule 11 for allegedly failing to conduct a reasonable inquiry into the law and facts underlying its tortious interference claim prior to filing the complaint.  As explained below, Rochem's argument is unavailing.

"Whether a litigant breaches his or her duty [under Rule 11] to conduct a reasonable inquiry into the facts and the law depends on the objective reasonableness of the litigant's conduct under the totality of the circumstances."  Lichtenstein, 173 F.3d at 23 (internal quotation marks omitted).  The factors that may be examined by a court include "the complexity of the subject matter, the party's familiarity with it, the time available for inquiry, and the ease (or difficulty) of access to the requisite information."  Navarro-Ayala v. Núñez, 968 F.2d 1421, 1425 (1st Cir. 1992).  It is not necessary, however, "that an investigation into the facts be carried to the point of absolute certainty."

<u>Dubois</u> v. <u>U.S. Dep't. of Agric.</u>, 270 F.3d 77, 82 (1st Cir. 2001).
Rather, it is sufficient if a factual contention "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3).

As discussed in the preceding section, CQ's legal and factual contentions at the summary judgment stage, after the benefit of the discovery period, were not necessarily sanctionable and the district court did not abuse its considerable discretion by denying Rochem's request that sanctions be imposed on CQ for the latter's contentions in opposing summary judgment. Our analysis, however, does not end there, since we have recognized that "a party who brings a suit without conducting a reasonable inquiry and based on nothing more than a prayer that helpful facts will somehow emerge, and who through sheer fortuity is rewarded for his carelessness, is nevertheless vulnerable to sanctions." <u>Lichtenstein</u>, 173 F.3d at 23 (citing <u>Garr</u> v. <u>U.S. Healthcare, Inc.</u>, 22 F.3d 1274, 1279 (3d Cir. 1994)). Thus, Rochem's claim that CQ did not perform an appropriate inquiry under Rule 11 prior to filing its complaint "must be viewed from the appropriate vantage point" (<u>i.e.</u>, the time of filing the complaint). <u>Id.</u> Nevertheless, we find that the district court did not abuse its discretion in rejecting Rochem's argument on this point.

CQ was first notified of Rochem's Clozapine purchases by an employee of Huizhou Successor, Mr. Fang Zhigang, who informed

CQ, inter alia, that Rochem had (1) obtained a copy of the CQ-Huizhou Contract in a meeting with Huizhou Successor, (2) subsequently purchased Clozapine from Huizhou Successor, and (3) sold the Clozapine to Ivax. CQ then confirmed through conversations with the President of Ivax, Mr. Don Marchione, that Mr. Marchione had met with Rochem -- after being contacted by Rochem on various occasions -- and had agreed to purchase the Clozapine on behalf of Ivax. Thus, CQ had reason to believe that Rochem knew about the CQ-Huizhou Contract and had induced Huizhou Successor to break it. CQ also had reason to believe that the alleged interference was improper in motive, since CQ and Rochem had a prior history of animosity.[8] Moreover, obtaining further corroborating information may have been difficult for CQ, since most of the relevant facts in this case allegedly occurred in China.

In view of these circumstances, we conclude that the district court did not abuse its broad discretion when it rejected Rochem's allegation -- that CQ violated its duty to conduct a reasonable inquiry into the facts and the law prior to filing suit -- and thus denied the imposition of sanctions on this ground. The fact that the case developed differently than what CQ foresaw at the time of filing suit, in light of the district court's finding

---

[8] As noted by the district court, CQ and Rochem had previously sparred over Rochem's marketing of the drug paclitaxel to the U.S. company Protraga, Inc.

that CQ had breached the CQ-Huizhou Contract, does not change our conclusion.[9]

## B. **The district court sufficiently explained its rationale for denying the imposition of sanctions**

We now turn to Rochem's fallback argument, the one it described in its reply brief as "the most important point" in its appeal, namely, that the district court abused its discretion by failing to adequately address Rochem's arguments and by stating in a conclusory fashion that CQ's claims were not frivolous. As explained below, we are unpersuaded.

As an initial matter, we disagree with Rochem's proposition that the district court made conclusory statements regarding the reasonableness of CQ's claims. Rather, the district court expressly analyzed the reasonableness of CQ's claims in a thorough thirty-five page memorandum and order, which opined, inter alia, that CQ's claims raised "interesting questions," CQ Int'l Co., 2010 WL 2292162, at *11, and that sanctions were denied because such "claims, although belatedly and insufficiently developed, were not frivolous," id. at *17. Furthermore, "[w]e have never required more than that the court's rationale be apparent from the face of the record and supported by the facts."

---

[9] As previously mentioned, CQ's contention regarding the limited scope of the two contracts (i.e., that the CQ-Huizhou Contract covered only non-micronized Clozapine, whereas the CQ-SJ/YH Contract solely contemplated micronized Clozapine) was not so patently frivolous that sanctions necessarily should have been imposed.

-22-

Lichtenstein, 173 F.3d at 24; see also Anderson, 105 F.3d at 769 (noting that, although the rationale for a denial of a motion for sanctions under Rule 11 "should be unambiguously communicated, the lack of explicit findings is not fatal where the record itself, evidence or colloquy, clearly indicates one or more sufficient supporting reasons").

Thus, it is unnecessary for us to dwell on Rochem's contention (i.e., that the district court abused its discretion by failing to adequately address Rochem's arguments). As made exceedingly clear from our previous analysis of Rochem's arguments in this appeal, the record in this case was sufficient to permit appellate review under the abuse of discretion standard. No more was needed. Accordingly, the district court did not abuse its discretion in denying sanctions.

### V. Conclusion

For the reasons stated, we affirm the district court's denial of sanctions against CQ.

**Affirmed**.