# United States Court of Appeals
## For the First Circuit

Nos. 12-2311
     16-1929


DAVID KAY ELDRIDGE; RAY ELDRIDGE, JR.; D. CHRIS ELDRIDGE, as
trustee, not individually, of the C. Eldridge 1994 GST Trust;
PATRICIA K. SAMMONS, as trustee, not individually, of the P.K.
Sammons 1994 Trust; K'S MERCHANDISE MART, INC.,

Plaintiffs, Appellants,

v.

GORDON BROTHERS GROUP, L.L.C.; WILLIAM WEINSTEIN; FRANK MORTON,

Defendants, Appellees.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Douglas P. Woodlock, U.S. District Judge]

---

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

---

Thomas E. Patterson, with whom Kristi L. Browne and The
Patterson Law Firm, LLC were on brief, for appellants.
     Theresa A. Foudy, with whom Turner P. Smith, Curtis, Mallet-
Prevost, Colt & Mosle LLP, Richard M. Zielinski, Peter D. Bilowz,
and Goulston & Storrs PC were on brief, for appellees.

---

July 13, 2017

---

**THOMPSON**, <u>Circuit Judge</u>.

### PREFACE

Today's case involves a moderately complex business dispute, rich with issues. On one side is plaintiff K's Merchandise Mart, Inc., which we call "Old K's" (for reasons that will soon become clear).[1] On the other side is defendant Gordon Brothers Group, L.L.C., which we call "Gordon," along with two of its executives, defendants William Weinstein and Frank Morton. Old K's challenges orders by the district judge granting defendants summary judgment and requiring it to pay them $35,000 in sanctions. After studying the briefs, the record, and the applicable law, we affirm the summary-judgment rulings but vacate the sanctions order and remand for reconsideration of the sanctions matter, assuming defendants still wish to pursue it.

### BACKGROUND

Consistent with the summary-judgment standard, we set out the essential facts in the light most complimentary to Old K's position, see <u>Collazo–Rosado</u> v. <u>Univ. of P.R.</u>, 765 F.3d 86, 89, 92 (1st Cir. 2014) — even though the "facts," as accepted for summary-judgment purposes, may not be the actual facts if the case went to trial.

---

[1] The judge dismissed the other plaintiffs in our caption. But Old K's does not contest their dismissal.

## Old K's Precarious Financial Position

Founded by David Kay Eldridge in 1957, Old K's sold clothing, appliances, sporting goods, jewelry, furniture, and other merchandise from retail stores in Illinois, Indiana, Iowa, Florida, Kansas, Kentucky, and Missouri.  And Old K's saw many years of success.  But by the early to mid-2000s, competition with ginormous retailers like Target, Wal-Mart, Best Buy, and Toys "R" Us caused Old K's financial distress — the company, for example, suffered a net loss of $1.8 million in 2004.

Faced with mounting losses, Old K's hired the investment firm William Blair & Co ("Blair") sometime in 2005 to help sell the company before the end of the year.  Blair explained that because Old K's was "unlikely" to find a buyer, "liquidation" was the "most logical" way to go.[2]  Blair later hooked Old K's up with Gordon, a company known nationwide for its expertise in retail liquidations.  Old K's hired Gordon in July 2005 to "provide preliminary advice and consultation to [Old K's] in connection with a possible orderly liquidation of [Old K's] 'big box' format stores" and to "develop a plan for the disposition of all inventory in the [s]tores with reference to the optimal timing of a 'store

---

[2] Broadly speaking, liquidation is "[t]he act or process of converting assets into cash," particularly "to settle debts." *Liquidation*, Black's Law Dictionary 1072 (10th ed. 2014).

closing' or similar themed sale." Eldridge, Old K's president, would later testify that the reason Old K's retained Gordon was to get "different viewpoints and evaluate" Old K's "options" in case Old K's "decide[d] . . . to liquidate."

Asked to analyze the liquidation value of Old K's merchandise and real estate, Gordon offered to buy Old K's in August 2005 for about $25 million. Convinced that Old K's was worth much more, Old K's rejected the offer and asked Gordon to finish its "[r]eal [e]state appraisal and inventory liquidation" analysis — adding that if liquidation ended up being the way to go, Old K's would do the liquidation itself before accepting an offer like the one Gordon had floated. But unfortunately for Old K's, its business continued hemorrhaging money in the months following Gordon's offer, posting losses of between $3.2 and $6.7 million for the fiscal year ending January 2006.

And things turned from bad to worse for Old K's when its principal lender, LaSalle National Bank ("LaSalle"), sent it a notice of default for violating financial-performance covenants, slashed its credit line, and dishonored checks to its vendors. LaSalle's Robert Barnhard, a former Gordon employee, then met with folks from Old K's in February 2006. During this confab, Barnhard flatly disagreed with Old K's proposed plan to improve profitability by reducing inventory and asked Old K's to prepare

a 13-week cash-flow projection and business plan.  Barnhard also hired consulting firm Alliance Management, Inc. ("Alliance") to gauge Old K's performance.  Issuing a report in late February 2006, Alliance noted that Old K's (a) had "[a]ccumulated losses . . . exceed[ing] $8 million dollars [over] a 3 year period," (b) "fac[ed] significant liquidity challenges that are material to the continuing business operations," and (c) had a "business model" that was outdated and "not sustainable."  After getting Alliance's report, LaSalle demanded that Old K's liquidate by about mid-April 2006.

Hoping to get LaSalle "off [its] back," Old K's hired consulting firm Buccino & Associates ("Buccino") in March 2006, with the aim of convincing LaSalle to extend the liquidation deadline — Buccino's founder and LaSalle's president were "personal friend[s]," apparently.  But Buccino struck out, meaning — according to Buccino — that Old K's "would be out of cash by October [2006], possibly as early as July [2006]," given its then-current financial and operational situation.  A Buccino official later recounted how LaSalle was pretty ticked off with the state of affairs, and "they [meaning LaSalle] required quick action to either replace their loan to take them out or they would foreclose."  That same official added that, given how over-collateralized the loan was, he "believe[d]" that Buccino "would

have found a bank" to provide take-out financing — though he also said that despite having "talked to several lenders," Buccino found "no interested parties" because of "the conditions that existed" and so Buccino's feeling was that Old K's "would probably have to file for bankruptcy." And in fact, Buccino prepared several liquidation analyses for Old K's.

With no financial savior in sight, Old K's entered into a forbearance agreement with LaSalle in which Old K's (among other things) admitted to certain defaults, expressed an intent to hold a liquidation sale, and agreed to file a voluntary bankruptcy petition "on or about April 17, 2006." To help it navigate the complexities of the bankruptcy process, Old K's hired a powerhouse law firm, Mayer Brown LLP, and a communications consultant, Sitrick and Company. Old K's also solicited bids to liquidate its assets from several liquidation companies — Gordon (which had never given up the idea of acquiring Old K's, it seems), Hilco, American Group, and Tiger Capital.

### Gordon's Representations

With the bankruptcy deadline fast approaching, Old K's reconnected with Gordon. And Gordon still had interest in acquiring Old K's. In an email to Gordon employees, Weinstein outlined his strategy:

> Guys, we felt like there was $20 ml of equity in the
> deal 6 months ago. It did not erode that quickly. . . .

> This could be a classic out of court deal. We guarantee the bank to shut them up. We go to a creditor rights lawyer and hire them to represent the trade in an out of court. We either propose a pot plan or percentage plan distribution at less than 100% and more than a bankruptcy would pay them. We pick up the "equity" in the discount. We run through x-mas out of court.

And during meetings in early April, Gordon made several representations to Old K's that are at the heart of this case:

- After achieving a "composition" with Old K's creditors — a "composition" is "[a]n agreement to settle a dispute or debt whereby one party abates part of what is due or claimed," see *Composition*, Black's Law Dictionary at 346 — Gordon planned to run the company as a going concern at least through the Christmas selling season before deciding on whether to continue operations, sell the company, or liquidate the company.

- Gordon had the expertise and experience to turn the company around and to keep it running.

- Gordon would get inventory flowing again by guaranteeing payment for future shipments from suppliers within a week.

- And Gordon would consult with the company's management before making any major decision affecting business operations.

By the way, everyone knew at the time that if no creditor composition happened, Gordon would liquidate the company straight away.

## Rise and Fall of New K's

After these comments, Old K's — represented by in-house and outside counsel — developed and executed a multi-step plan with Gordon:

*Step 1.* Old K's signed a letter of intent — a document "detailing the preliminary understanding of parties who plan to enter into a contract or some other agreement." *Letter of Intent*, Black's Law Dictionary at 1044. As pertinent here, the letter of intent provided that Gordon would become the "exclusive agent" for Old K's "in connection with the continued operation and/or liquidation of the Company's business operations and disposition of assets of the Company, . . . all in [Gordon's] sole discretion" — though Gordon promised to "use best efforts to keep the Company's officers reasonably informed of [its] decision-making process."[3] Old K's attorneys at Mayer Brown added the words "and/or liquidation of" during the drafting process.[4] Two weeks after signing the letter of intent, Gordon's Morton emailed a colleague that he thought Gordon could "do 2 or 3 store wide events during the next 6 months without taking the juice out of the liquidation."

---

[3] The letter of intent refers to Old K's as the "Company."

[4] David Kay Eldridge said at a deposition that he voiced no objection to the "and/or liquidation of" language in the letter of intent because — to quote his testimony — those words "didn't mean anything" since Old K's could "fire" Gordon if Gordon wanted to liquidate the business but Old K's did not.

*Step 2.* Gordon paid about $40 million to pay off Old K's debt to LaSalle, relieving Old K's from the imminent loss of its financing and from the LaSalle-demanded bankruptcy filing. Around this same time, Gordon decided to settle with Old K's creditor-suppliers, thereby avoiding an involuntary-bankruptcy petition by them. As part of that effort, Gordon's Weinstein worked with Old K's and its attorneys to draft letters to creditor-suppliers describing the plans for the new company. In one email, Weinstein suggested that Old K's tone down the draft:

> Where it says [Gordon] desires to run this as a going concern, I would rather soften this to say that we will do so as we evaluate whether a restructuring of the company is feasible. Something like this. I do not want to sound like we are committing to this.

A few days later, Weinstein returned to this theme, telling Old K's and its lawyers that the draft should not puff up Gordon's intentions:

> It is clearly our intention to run the company for a period of time while we determine what the right configuration/make-up of the business is. We just want to be clear that this is a broken business that we see some underlying value in. However, there are no sure things here and we don't want to over promise.

The letter did not get "softened in response to Weinstein's" comments (a quote lifted from the brief Old K's filed with us).

*Step 3.* Gordon and Old K's entered into a Limited Liability Company Agreement ("LLC Agreement") in May 2006, with lawyers for Old K's taking part in the negotiations. The LLC

- 9 -

Agreement created New K's Merchandise LLC ("New K's"), a Delaware company that inherited the business operations of Old K's. Old K's got a 22.5% membership interest in New K's, and Gordon got a 77.5% membership interest. The LLC Agreement designated Gordon as the "sole manager" of New K's. As manager, Gordon had the power to "exercise all the powers and privileges granted to a limited liability company" — including the right to liquidate the entity. But Gordon had to "use its best efforts to consult with [Old K's] regarding [Gordon's] conduct of the affairs of [New K's]," "keep [Old K's] fully informed of any material decisions and activities of [Gordon] with respect to [New K's]," and make documents available upon "reasonabl[e] request." The LLC Agreement also set up a "Liquidating Distribution" scheme, allowing Old K's to recover a minimum distribution of $3 million (subject to certain deductions) if the creditors were composed without a bankruptcy filing. The LLC Agreement had a choice-of-law clause specifying that Delaware law governs the parties' contract — as well as an integration clause, saying that the "Agreement . . . embodies the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter."

Gordon started running New K's business operations as of May 1, 2006 but kept key personnel from Old K's in place — including

Richard Powers, Old K's chief financial officer, who stayed on as New K's chief financial officer. Powers later acknowledged that had Old K's not entered into the LLC Agreement, the most likely scenario would have been bankruptcy liquidation. And he also acknowledged that three weeks later, he got a "financial model" from Buccino (now working for New K's) that contemplated the company's running normally through October 2006 and then operating in "liquidation mode."

After taking the reins of New K's, Gordon succeeded in composing the creditors outside of bankruptcy, getting them to take 50% of the amount owed and to release the shareholders of Old K's from potential claims. The creditors' advisor had told them that Gordon "has indicated that it intends to operate [New K's] at least through the coming Christmas season." And he later testified in his deposition that if Gordon "had already concluded as of May 1" that it was "going to liquidate this company," then he was lied to. Anyway, a few weeks after the LLC Agreement's signing, Gordon started sending out financial guarantees to suppliers to restock the company. But it took a while to get the suppliers to start shipping again because — to quote a letter from Powers — "many of our vendors" wanted to wait "until the composition [of creditors] was approved and implemented," which did not happen until mid-July 2006. Apparently some suppliers were still miffed that Old K's

had stiffed them weeks earlier. And even with a "100 percent rock solid guarantee" from Gordon, some vendors "wouldn't ship" inventory to New K's, according to Gordon's Weinstein.

Whether Gordon had tried its best to improve New K's operations, merchandising, advertising, *etc.*, is a bone of contention between the parties. But in October 2006, having deemed the turn-around efforts a failure, Gordon publicly announced it was liquidating New K's and closing all stores by year's end. And when Gordon made that announcement, none of the plaintiffs complained to Gordon or took any action to stop the liquidation. New K's business operations eventually stopped in January 2007. And its wind-down phase started after that.

At the beginning of the liquidation phase, Old K's tried to get financial and performance info from Gordon, but to no avail. Old K's did get $1,748,217 from Gordon sometime in March 2008 — a figure Gordon claimed represented the minimum $3 million distribution promised in the LLC Agreement, minus certain adjustments. Old K's eventually got some documents but asked for more because some appeared to be missing. And a bit later, Old K's received two CDs containing info that caused Old K's to suspect that Gordon had never intended to run New K's as a going concern.

**Off to Federal Court**

Old K's responded with this suit in federal court under diversity jurisdiction. Count I alleged defendants had fraudulently induced Old K's to enter into the LLC Agreement by (among other things) misrepresenting that defendants intended to turn the company around and that they had the know-how and the experience to do just that. Count II sought an accounting of New K's financial condition and operations, plus the handing over of documents Old K's had requested but had not gotten. And finally, Count III alleged defendants breached the LLC Agreement — a claim focused principally on a bunch of accounting, "best efforts," and payment breaches, though the count included a sentence alleging defendants breached an implied duty of good faith and fair dealing inherent in the LLC agreement when they committed "the aforementioned fraud and mismanagement."

After each party inflicted tons of discovery on the other, defendants moved for partial summary judgment. Pertinently, defendants argued that the fraudulent-inducement claim failed because the complained-of comments (a) were not actionable misrepresentations and (b) were too vague or immaterial (or both), so any reliance on the part of Old K's was unreasonable, especially given express contract terms inconsistent with the alleged promises and the integration clause that explicitly

- 13 -

disavowed commitments not included in the contract (and by contract, defendants meant the LLC Agreement). Defendants also insisted that the breach-of-contract claim misfired "to the extent it purport[ed] to assert a claim for breach of the implied covenant of good faith and fair dealing arising out of the LLC Agreement." Any such claim, defendants wrote, flopped because Old K's did not identify "which of the allegations of fraud and/or mismanagement" infracted the covenant — and, defendants added, any suggestion that a breach of that covenant occurred because defendants did not set out to turn New K's around fizzled since the LLC Agreement gave Gordon the authority to liquidate New K's. Old K's opposed defendants' partial-summary-judgment motion but did not file its own summary-judgment motion at that time.

Basically agreeing with defendants' analysis, the judge granted defendants partial summary judgment on the claims of fraudulent inducement and breach of an implied covenant of good faith and fair dealing. The judge then ordered the parties to file a joint-status report explaining what further action was needed to get this case to final judgment.

Responding, Old K's pertinently said that what remained against defendants were (a) an accounting claim; (b) a breach-of-contract claim for failing "to consult" with Old K's and failing to correctly "calculat[e] Plaintiff's share in the 'Accounting'"

- 14 -

that "forms the basis of the distribution made to Plaintiff"; and (c) a claim for breach of the implied covenant of good faith and fair dealing given the way defendants "operat[ed]" New K's. Among other things, defendants insisted that the judge had already dismissed "the breach of the implied covenant claim." And they said that they might ask "for permission to file" another summary-judgment motion — "depending on the exact contours of the elements of Plaintiff's remaining claims."

At a follow-up conference, the judge said he was "not going to sort through" whether he had dismissed the "breach of the implied covenant claim." "[Y]ou can deal" with that in a summary-judgment motion, the judge added. And then the judge gave defendants the go-ahead to move for summary judgment on the still-existing claims. Turning to counsel for Old K's, the judge said he assumed "from plaintiff['s] musings" that it does not "believe that [it] can file for summary judgment, so [it] will be opposing defendants'" summary-judgment motion. The attorney for Old K's said nothing in response.

Roughly two weeks after the conference, though, Old K's asked the judge for leave to cross-move for summary judgment on all the "remaining claims" it had identified. Defendants opposed this request, insisting Old K's could not point to uncontested facts establishing its right to judgment as a matter of law — hence

- 15 -

dealing with a cross-motion for summary judgment would waste defendants' and the judge's time and energy. The judge ultimately gave Old K's permission to file a summary-judgment motion — but the judge "advised" counsel "to consider the application of Fed. R. Civ. P. 11 to any such motion if the motion has no conceivable likelihood of success."[5]

In their second summary-judgment motion, defendants — as relevant here — argued as follows: The judge had already tossed out the entire claim for breach of an implied covenant of good faith and fair dealing, meaning — defendants' argument continued — that Old K's was dead wrong to suggest that a claim premised on their "operation" of New K's somehow survived the judge's earlier edict. Defendants also asserted that the accounting claim got mooted by the documents they had produced during the many years of discovery. They also later argued Old K's did not respond to their accounting-claim arguments and so the judge should dismiss that claim. As for the breach-of-contract claim, defendants contended that, as argued by Old K's, this claim basically boiled down to three theories — (a) defendants had wrongly failed to consult with Old K's; (b) they had wrongly denied Old K's its share of the profits because they did not account for $13.9 million in "missing

---

[5] For brevity, we occasionally use "Civil Rule 11" to refer to Fed. R. Civ. P. 11.

- 16 -

inventory"; and (c) they had wrongly calculated the liquidating distribution. And having framed the breach-of-contract claim this way, defendants said they should prevail because (a) "it is impossible to imagine a measure of damages" for the failure-to-consult "breach that would not be unduly speculative"; (b) Old K's debuted the "missing inventory" damages theory after discovery had closed, a discovery violation that called for the theory to be stricken under Fed. R. Civ. P. 37(c); and (c) the evidence showed defendants had given Old K's the correct liquidating distribution.[6]

Old K's opposed defendants' motion and cross-moved for summary judgment in its favor. As Old K's saw it, defendants had breached the implied covenant of good faith and fair dealing by mismanaging New K's furniture department and had breached the LLC Agreement by not making the proper distribution payment.

Defendants, in turn, opposed the motion by Old K's. And convinced that this motion had "no chance" of succeeding, they also moved for Civil-Rule-11 sanctions against the attorneys representing Old K's — a motion opposed by Old K's.

The judge granted defendants' summary-judgment motion and denied the cross-motion by Old K's. And on top of that, the judge ordered Old K's to pay defendants $35,000 in sanctions for

_____

[6] For simplicity, we sometimes refer to Fed. R. Civ. P. 37(c) as "Civil Rule 37(c)."

- 17 -

filing what he thought was a hopeless "tit-for-tat" summary-judgment motion.

Which takes us to today, with Old K's contesting both the grants of summary judgment to defendants (Old K's does not contest the denial of its summary-judgment motion) and the imposition of sanctions.[7]

## SUMMARY-JUDGMENT ISSUES

The parties fight considerably over the propriety of the judge's grants of summary judgment to defendants. We have a lot of ground to cover. But we are up to the challenge.

### Standard of Review

We assess the judge's grants of summary judgment *de novo*, seeing whether — after taking the facts in the light most flattering to Old K's — "there is no genuine dispute as to any material fact and [defendants are] entitled to judgment as a matter of law." See Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 21 (1st Cir. 2016). A dispute is "genuine" if the record permits a sensible factfinder to decide it in either party's favor. See, e.g., Chung v. StudentCity.com, Inc., 854 F.3d 97, 101 (1st Cir. 2017). And a fact is "material" if its existence or nonexistence

---

[7] We will note additional details as they become relevant to the ensuing analysis.

"might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

With the standard of review out of the way, we turn to the issues in play.

## Fraudulent Inducement

### (a)
### *Parties' Basic Positions*

To hear Old K's tell it, Gordon made the following representations (which we mentioned earlier) to get Old K's to sign on to the LLC Agreement:

- After composing the creditors, Gordon intended to operate New K's as a going concern at least through the 2006 Christmas selling season before deciding on whether to continue operations, sell the company, or liquidate the company.

- Gordon had the expertise and experience to make the company profitable and to save it from bankruptcy.

- Gordon would get inventory flowing again by guaranteeing payment for future shipments from suppliers within a week of signing the LLC Agreement.

- And Gordon would consult with New K's management before making any major decision affecting the company's operations.

Protesting that Gordon never intended to do anything other than liquidate New K's, Old K's argues that Gordon made these

- 19 -

representations knowing them to be false or with reckless disregard for their truth. "Substantial evidence," Old K's adds, "showed [Gordon's] intent or permitted reasonable inferences of it." And Old K's reasonably relied on Gordon's representations — or so Old K's argues. Plus, says Old K's, Gordon's comment about its turnaround expertise was hardly inactionable "puffery," despite what the judge said.

Accepting for summary-judgment purposes only that Gordon actually made these representations, defendants still believe the judge ruled correctly. And that is because the offending comments either were "inactionable" (since they were mere predications of future conduct, puffery, or opinion) or were "matters on which Old K's had no basis to rely."

(b)
*Legal Primer*

The parties agree that Illinois law governs the fraudulent-inducement claim — probably because the representations occurred there, as the judge found and the parties do not dispute.[8] We of course can accept the parties' agreement if it is reasonable,

---

[8] Because fraud is a tort, see Enter. Recovery Sys., Inc. v. Salmeron, 927 N.E.2d 852, 858 (Ill. App. Ct. 2010), the fraudulent-inducement claim does not fall within the scope of the LLC Agreement's Delaware-choice-of-law clause.

see, e.g., Katz v. Pershing, LLC, 672 F.3d 64, 72 (1st Cir. 2012), and this one is.

In Illinois, a fraudulent-inducement claim requires clear and convincing proof that the defendant made (a) a false statement; (b) of material fact; (c) which the defendant knew or believed to be false; (d) with the intent to induce the plaintiff to act; (e) the plaintiff reasonably relied on the false statement; and (f) the plaintiff suffered damages a result. See, e.g., Jordan v. Knafel, 880 N.E.2d 1061, 1069 (Ill. App. Ct. 2007). But (and it is an important "but") a false statement of an "intent[] to perform future conduct" — what the law calls "promissory fraud" — is not actionable unless it is part of a "scheme" to defraud. See, e.g., HPI Health Care Servs. v. Mt. Vernon Hosp., Inc., 545 N.E.2d 672, 682 (Ill. 1989); Desnick v. Am. Broad. Cos., 44 F.3d 1345, 1354 (7th Cir. 1995) (Posner, C.J.) (discussing Illinois law).

The line between "a mere promissory fraud and a scheme of promissory fraud" will not always be clear. See Desnick, 44 F.3d at 1354. Lots of "promises belong to the realm of puffery, bragging, 'mere words,' and casual bonhomie, rather than to that of serious commitment" — "[t]hey are not intended to and ordinarily do not induce reliance;" and for promises like these, "a healthy skepticism is a better protection against being fooled by them than the costly remedies of the law." Id. With this in mind,

- 21 -

courts hold that "promissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy." Id. Promissory fraud is a "disfavored cause of action," presumably "because fraud, focusing as it does on a subjective state of mind, can be very easy to allege and very difficult to prove or disprove," Hollymatic Corp. v. Holly Sys., Inc., 620 F. Supp. 1366, 1369 (N.D. Ill. 1985) (analyzing Illinois law) — which is why "the burden on a plaintiff claiming promissory fraud is deliberately high," Bower v. Jones, 978 F.2d 1004, 1012 (7th Cir. 1992) (ditto).

Moving from the general to the specific, we now give our take on the four alleged misrepresentations.

(c)
*Our Take*

First up is Gordon's promise to run New K's as a going concern through the 2006 Christmas selling season before deciding whether to liquidate the business. To our way of thinking, what trips Old K's up is the reasonable-reliance requirement. As the district judge noted, by the time the parties signed the LLC Agreement — with Old K's represented by white-shoe law firm Mayer Brown, remember — Old K's knew that a handful of consulting and investment firms had recommended the liquidation of Old K's ASAP.

- 22 -

Also and importantly, Gordon's Weinstein had told Old K's just before the LLC Agreement became final that while Gordon hoped to run the business "as a going concern," Gordon would do so as it "evaluate[d] whether a restructuring of the company is feasible." Weinstein made it crystal clear to Old K's that he did "not want to sound like" Gordon was "committing to this." And he also stressed around this time that "this is a broken business that we see some underlying value in" but that "there are no sure things here and we don't want to over promise."[9] Given the circumstances, Old K's could not ignore the possibility of a liquidation before 2006's end and so could not reasonably believe that Gordon made a reliable pledge to run Old K's as a going concern during that entire period.

Just a minute, says Old K's: we must (to quote its brief) "consider Buccino's testimony" that it thought it could find "replacement financing apart from Gordon." But Old K's ignores how Buccino stressed that it had found "no interested parties" because of "the conditions that existed" and that it had

---

[9] These quotes came from emails Weinstein had sent to Old K's (among others) weighing in on a proposed letter to the creditor-suppliers. Hoping to show reasonable reliance here, Old K's plays up how the draft "letter was not softened" as Weinstein had suggested. But what matters for current purposes is that Weinstein shared these concerns with Old K's — thus this argument does Old K's no good.

generated liquidation analyses for Old K's. And it ignores how Alliance pulled no punches in saying that Old K's "business model" was out-of-date and "not sustainable." Also, we find it passing strange that Old K's insists it relied on Gordon's no-liquidation assurance when the LLC Agreement — which top-flight lawyers for Old K's helped negotiate — specifically mentioned liquidation as a possibility and left the liquidation decision in Gordon's hands. So the attempt by Old K's to get around the reasonable-reliance problem here comes to naught. Cf. generally D.S.A Fin. Corp. v. County of Cook, 801 N.E.2d 1075, 1081 (Ill. App. Ct. 2003) (explaining that "the court considers whether the party was reasonable in relying on his adversary's representation in light of the facts within his actual knowledge and any he might have discovered by the exercise of ordinary prudence"); Chic. Exp. Packing Co. v. Teledyne Indus., Inc., 566 N.E.2d 326, 329 (Ill. App. Ct. 1990) (noting that "[a] person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another").

Next up is Gordon's comment that it had the experience and expertise to turn the company around. The problem for Old K's is that this comment falls under the heading of vague or "puffing," i.e., "a sales pitch that is intended, and that a reasonable person in the position of the 'promisee' would understand, to be

- 24 -

aspirational rather than enforceable — an expression of hope rather than a commitment." Speakers of Sport, Inc. v. ProServ, Inc., 178 F.3d 862, 866 (7th Cir. 1999) (Posner, C.J.) (discussing Illinois law). It is not like Gordon made a specific factual remark that could be proven true or false, such as "Gordon has saved 15 businesses from liquidation over the last 10 years." Simply put, the comment is nonactionable. Cf. Cont'l Bank, N.A. v. Meyer, 10 F.3d 1293, 1299 (7th Cir. 1993) (concluding that a bank's comment that "competent general partners" would manage the partnership was "no more than opinion").

Trying to persuade us otherwise, Old K's turns to Schrager v. North Community Bank, 767 N.E.2d 376 (Ill. App. Ct. 2002). The plaintiff there met with the defendants to discuss a potential investment in a real-estate venture. Id. at 378. And he asked them to tell him what they could about the project. Id. at 379. They responded that the investors were "excellent real estate developers, very good customers of the bank, and very good business men [sic]." Id. But in reality the defendants knew (among other things) that the venture's account was often overdrawn and that an investor was in bankruptcy. Id. at 383-84. The court concluded that the defendants had "actual detailed knowledge" about the investors' "financial and banking history" and so "[t]he circumstances surrounding [their] statements could reasonably

support the inference that [they] were summarizing their detailed knowledge" for the plaintiff.  Id. at 384.  Consequently, a rational factfinder could — on the basis of this record — conclude that the statements "were representations of material fact rather than opinions."  Id.

The difference between Schrager and our case is one of night and day, however.  For the situation here — as the district judge below recognized — is not one in which defendants represented that Gordon had turnaround experience when they knew they had none.  The big reason we say this is because a Gordon employee testified to having nearly 20 years of retail experience before joining Gordon in 1997.  Old K's tries to downplay the employee's experience, calling it "sporadic" and not "germane."  But that is a matter of opinion.  And so we stand by our conclusion that the representation concerning Gordon's turnaround experience and expertise was nonactionable opinion amounting to sales puffery.

Now consider Gordon's next comment that it would beef-up inventory by offering suppliers "its financial guaranties" within a week of the LLC Agreement's signing.  Gordon did provide guarantees and *did* restock the shelves, just not as quickly as Old K's would have liked.  But even one of Old K's officers acknowledged that "many of [its] vendors" were waiting for the "approv[al] and implement[ation]" of the creditor composition

- 26 -

before "shipping new merchandise" — and the "approv[al] and implement[ation]" stuff did not occur until two months after the LLC Agreement's signing, don't forget. Sure, Gordon did not offer guarantees within the first week of taking control of the company. But Gordon did start offering them within that first month. And despite getting Gordon's "100 percent rock solid guarantee," some vendors still "wouldn't ship" wares to New K's. So the suppliers' doubts about doing business with the company was hardly something Gordon could control. Ultimately, we do not think the alleged promise concerning future conduct of third-party suppliers that Gordon could not control is especially "egregious" or "embedded" in a large scheme inducing reasonable reliance. See Desnick, 44 F.3d at 1354.

The same goes for Gordon's promise to consult with the management of Old K's before making major decisions. To back up its argument, Old K's points to testimony showing that Gordon sometimes held meetings without key members of Old K's. But Gordon's keeping Old K's out of certain meetings does not mean that Gordon failed to (in the lingo of the LLC Agreement) "use its best efforts to consult" with Old K's in other ways, like through other meetings, perhaps, or by phone (two examples that spring to mind) — hence our conclusion that the trumpeted evidence does not

show the type of appalling behavior for which Illinois law should "provide a remedy." See id. Enough said about that.

Having worked our way through these arguments, we conclude that the summary-judgment ruling for Gordon on the fraudulent-inducement claim must stand.

## Breach of the Implied Covenant of
## Good Faith and Fair Dealing

(a)
*Parties' Basic Positions*

Tucked away in the complaint's breach-of-contract count (Count III) is a single sentence saying Gordon "breached the contractual covenant of good faith and fair dealing implied [in] the LLC Agreement when it engaged in the aforementioned fraud and mismanagement." In its briefs to us, Old K's argues vigorously that Gordon violated this implied covenant in two ways: first by its pre-holiday-season "decision to liquidate"; and second by its mismanagement of the furniture and jewelry departments — recall that the mismanagement claim by Old K's surfaced in its cross-motion for summary judgment. Not to be outdone, defendants vigorously respond that these breach-of-the-implied-covenant theories fail, first because the LLC Agreement specifically gave Gordon the *unilateral right* to liquidate New K's; and second because Old K's did not raise the mismanagement issue in opposing defendants' first summary-judgment motion (a motion that had asked

- 28 -

the judge to enter judgment on the entirety of the breach-of-the-implied-covenant claim), which — the argument goes — means Old K's waived that issue.

(b)
*Legal Primer*

Consistent with the LLC Agreement's choice-of-law provision, we — like the parties — apply Delaware law to this contract-related claim.

Delaware law says every contract contains an implied duty of good faith and fair dealing. See, e.g., Enrique v. State Farm Mut. Auto. Ins. Co., 142 A.3d 506, 511 (Del. 2016). This implied covenant forbids a party from acting arbitrarily or unreasonably so as to prevent the other party "from receiving the fruits" of the contract. See Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005) (quoting Wilgus v. Salt Pond Inv. Co., 488 A.2d 151, 159 (Del. Ch. 1985)). But the point of the implied covenant is to respect the parties' "reasonable expectations at the time of contracting," not to stick them with new ones — it is not a magic wand for reworking a "contract to appease a party" who now thinks the deal is "bad." See Nemec v. Shrader, 991 A.2d 1120, 1126 (Del. 2010); see also Blaustein v. Lord Balt. Capital Corp., 84 A.3d 954, 959 (Del. 2014) (stressing that "[t]he implied covenant of good faith and fair dealing cannot be employed to impose new contract terms that could have been

- 29 -

bargained for but were not"). So understood, the implied covenant provides an "extraordinary legal remedy" that is "limited" to "extraordinary" circumstances. Nemec, 991 A.2d at 1128. It can be used as a gap-filler "to handle" situations "neither party anticipated," id. at 1125 — if and only if "it is clear from the contract that the parties would have agreed to [the implied] term had they thought to negotiate the matter." Corp. Prop. Assocs. 14 Inc. v. CHR Holding Corp., C.A. No. 3231-VCS, 2008 WL 963048, at *5 (Del. Ch. Apr. 10, 2008) (refusing to use the implied covenant to protect a party from dilution by cash dividends when the parties did not include that protection in the contract). What this means is that the implied covenant "does not apply when the contract addresses the conduct at issue." Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC, 112 A.3d 878, 896 (Del. 2015).

We now analyze the parties' arguments (tackling them in the order in which Old K's briefed them), knowing full well that under Delaware law it is a "rare" case where a court would be justified in "imposing an obligation on a contracting party through the covenant of good faith and fair dealing." Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co., No. Civ. A. 1668-N, 2006 WL 2521426, at *6 (Del. Ch. Aug. 25, 2006) (quoting Frontier Oil Corp. v. Holly Corp., No. Civ. A. 20502, 2005 WL 1039027, at *28 (Del. Ch. Apr. 29, 2005)).

- 30 -

(c)
*Our Take*

Because the LLC Agreement — as negotiated by the parties, with Old K's represented by top-notch lawyers — specifically gave Gordon sole discretion to liquidate the company, Old K's is left to argue that it "rel[ied] on the implied obligation of good faith to limit [Gordon's] discretion."  Old K's cites *no* authority supporting its contention.  Cf. generally Town of Norwood v. Fed. Energy Regulatory Comm'n, 202 F.3d 392, 405 (1st Cir. 2000) (explaining that "developing a sustained argument out of . . . legal precedents" is the litigants' job, not the court's).  But even putting that problem aside, we think the argument is not a winner for Old K's.

Old K's and Gordon both foresaw the possibility that New K's could end up being liquidated.  And they — with first-rate attorneys at their side — explicitly left the liquidation decision up to Gordon, without limiting the timing of that decision.  Cf. Blaustein, 84 A.3d at 959 (noting that "the implied covenant is used in limited circumstances to include what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting," and concluding that a shareholder-plaintiff's claim — that the implied covenant created a duty on the defendant-company's part to repurchase stock at full price — failed because the shareholder

- 31 -

agreement gave "both parties complete discretion in deciding whether, and at what price, to execute a redemption transaction," without containing "any promise of a full value price" (internal quotations omitted)). Given these circumstances, the judge correctly dismissed this claim on summary judgment, see id. — after all, as we have been at pains to explain, "[t]he implied covenant of good faith and fair dealing cannot properly be applied to give the plaintiffs contractual protections that 'they failed to secure for themselves at the bargaining table,'" Winshall v. Viacom Int'l Inc., 76 A.3d 808, 816 (Del. 2013) (quoting Aspen Advisors LLC v. United Artists Theatre Co., 861 A.2d 1251, 1260 (Del. 2004)); accord Nemec, 991 A.2d at 1128 (emphasizing that the implied covenant "is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract" and stressing too that one does not violate the implied covenant "by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party").

As for the implied-covenant claim concerning the mismanagement of the furniture and jewelry departments, we side with defendants on this issue too. Our reasoning is simple. Defendants' original partial summary-judgment motion asked the judge to reject "the entirety" of the implied-covenant claim as a

matter of law.  But in its opposition, Old K's did not suggest that these mismanagement faux pas provided a separate basis for its implied-covenant claim — the pertinent part of its opposition focused only on its idea that the liquidation decision violated the implied covenant.  And this omission — as the district judge himself ruled — constitutes waiver of any implied-covenant claim premised on the mismanagement of the furniture and jewelry departments.  See Iverson v. City of Boston, 452 F.3d 94, 103 (1st Cir. 2006) (holding that "plaintiffs' failure to mention — let alone adequately to develop — the . . . theory in their opposition to the [defendant]'s dispositive motion defeats their belated attempt to advance the theory on appeal").

Ever persistent, Old K's argues that it preserved the mismanagement aspect of the implied-covenant claim in two ways.  It first points to five paragraphs in the complaint as proof that it properly raised the claim.  Here are some snippets from the paragraphs Old K's highlights:

- "Gordon Brothers had no intent to act quickly to restore inventory."

- "Gordon Brothers used its control of New K's as a vehicle to unload unwanted and unsold inventory."

- "Gordon Brothers refused the Edlridges' request to transfer diamonds from one department to the other."

- 33 -

- "Gordon Brothers used . . . a false cover story to announce the liquidation sale in October, 2006 . . . after representing that it intended to operate the business rather than liquidate . . . ."

- "Gordon Brothers breached the contractual covenant of good faith and fair dealing implied [in] the LLC Agreement."

Old K's then points to what its lawyer said at the argument on Gordon's first partial motion for summary judgment. "You say that [defendants] did not use their discretion properly to effect a liquidation," the judge said, speaking to counsel for Old K's — "[t]hat is really what it comes down to, right?" And counsel responded (and this is the money quote, as far as Old K's is concerned):

> That is one thing, and [defendants] also made a series of operational decisions that were also not in good faith, the failure to purchase the inventory, which we have discussed, overpricing the inventory, which we have submitted affidavits on, that tended to drive K's customers away, ordering furniture that wouldn't appeal to K's market, and that was a subject of a previous liquidation . . . . There are operational issues as well as the decision to liquidate.

"No intent to waive or any failure to raise can be gleaned from" what its lawyer said at the argument on Gordon's partial summary-judgment motion, at least that is what Old K's says.

Color us unconvinced. For one thing, the problem still remains that Old K's did not raise the mismanagement facet of its

- 34 -

breach-of-the-implied-covenant claim in its opposition paper —
which is a no-no given Iverson.  For another thing, counsel
discussed mismanagement at the motion hearing in the context of
suggesting that Gordon "operat[ed]" New K's in such a way as to
"guarantee[]" liquidation would follow — a comment that speaks to
a breach-of-the-implied-covenant claim based on an unjustified
liquidation (*i.e.*, the original and ultimately rejected claim),
not a claim based on mismanagement of the furniture and jewelry
departments.  And finally, even supposing that the spotlighted
paragraphs and comments touch on the mismanagement of the furniture
and jewelry departments in some general way, Old K's still cannot
prevail because "a party is not at liberty to articulate specific
arguments for the first time on appeal simply because the general
issue was before the district court."  United States v. Slade, 980
F.2d 27, 31 (1st Cir. 1992).

As an "[a]lternative[]" argument, Old K's contends that
the judge "should have exercised [his] discretion to consider the
argument on the merits . . . , there was no impediment to do so,
rather than refuse to do so under waiver."  True, "extraordinary
circumstances occasionally may justify an exception to the raise-
or-waive rule" — note the words "extraordinary circumstances,"
"occasionally," and "may."  See Farm Credit Bank of Balt. v.
Ferrera-Goitia, 316 F.3d 62, 68 n.6 (1st Cir. 2003); see also Lang

- 35 -

v. <u>Wal-Mart Stores E., L.P.</u>, 813 F.3d 447, 455 (1st Cir. 2016) (discussing some exceptions).  But Old K's makes no effort to fit its case within any exception.  So we need not dwell on this argument any further.  <u>See</u> <u>Tutor Perini Corp.</u> v. <u>Banc of Am. Sec. LLC</u>, 842 F.3d 71, 84-85 (1st Cir. 2016).

Finding no error with the judge's handling of the implied-covenant claim, we trudge on.

**Breach of Contract**

Old K's contests the grant of summary judgment to defendants on its breach-of-contract claim premised on the allegation that they (a) denied Old K's its share of the "$13.9 million" in "missing inventory" and (b) miscalculated the liquidating distribution.  On the missing-inventory front, the judge excluded the damages theory — which Old K's first revealed in the joint-status report, well after the close of discovery — as a sanction under Civil Rule 37(c).  And on the liquidating-distribution front, the judge concluded that the evidence established the correctness of the distribution amount. We examine each issue in turn.

(a)
*Missing-Inventory Issue*

Taking up the missing-inventory issue first, we note that Old K's candidly (and commendably) "concedes" that it violated its "obligation to supplement its discovery" one time by not

- 36 -

disclosing the relevant "damages theory with all calculations" until the filing of the joint-status report — a filing that occurred months and months after discovery had *closed*. Civil Rule 37(c) provides that "[i]f a party fails to provide information . . . as required . . . the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, *unless the failure was substantially justified or is harmless*." Fed. R. Civ. P. 37(c)(1) (emphasis added). As the party facing sanctions, Old K's had the burden of proving substantial justification or harmlessness to get a penalty less severe than evidence preclusion. See, e.g., Wilson v. Bradlees of New Eng., Inc., 250 F.3d 10, 21 (1st Cir. 2001). The briefs of Old K's in this court talk a lot about substantial justification and harmlessness. But as the district judge found — and Old K's does not dispute — Old K's "d[id] not claim substantial justification or harmlessness," even though defendants argued "that the missing inventory claim should be dismissed from the case due to [the] failure to disclose it as a money damage claim" and even though Old K's had the "burden to show that [Civil] Rule 37(c) preclusion does not apply."[10] This is significant

---

[10] Taking a belt-and-suspenders approach, the judge added that "even if [Old K's] had attempted to do so, the attempt would have been unsuccessful."

because, as we said, arguments not seasonably advanced below "cannot be raised for the first time on appeal." <u>Bos. Redevelopment Auth.</u> v. <u>Nat'l Park Serv.</u>, 838 F.3d 42, 50 (1st Cir. 2016). And Old K's gives us no sound reason to think that any of the "narrowly configured and sparingly dispensed" exceptions to the raise-or-waive rule apply. <u>See</u> <u>Daigle</u> v. <u>Me. Med. Ctr., Inc.</u>, 14 F.3d 684, 688 (1st Cir. 1994). So we need say no more about the missing-inventory issue. <u>See</u> <u>id.</u>; <u>see also</u> <u>Tutor Perini Corp.</u>, 842 F.3d at 84-85.

(b)
*Liquidating-Distribution Issue*

We need not say much about the charge that defendants miscalculated the liquidating distribution. Here is why. Old K's helpfully concedes that the fate of this aspect of its damages model turns on whether "this court permits the claim of inventory and furniture mismanagement to go forward." Those claims are dead

on arrival. Which means that is that for the liquidating-distribution issue.

## Bottom Line

Though vigorously pursued, none of the attacks on the summary-judgment rulings succeeds.[11] So we shift to the sanctions ruling.

## SANCTIONS ISSUES

As we said a few pages ago, the judge sanctioned Old K's under Civil Rule 11 for pressing ahead with a cross-motion for summary judgment. Regarding the judge's analysis, it is enough for us to say the following:

1. Among the judge's reasons for thinking that the mismanagement-of-the-furniture-department piece of the implied-covenant claim failed was his belief that Old K's "provide[d] no basis for the conclusion that any mismanagement" on Gordon's part "was motivated by a culpable mental state."[12] And as support for his "culpable mental

---

[11] Given our above conclusions, we need not referee the parties' disputes over other summary-judgment-based issues, like whether or how the LLC Agreement's integration clause affects the fraudulent-inducement claim, or whether the request for benefit-of-the-bargain damages is too speculative.

[12] For anyone wondering, the judge did bring up how he had earlier deemed waived any claim that defendants had breached the implied covenant by mismanaging the furniture department — a decision he had made because Old K's "had not raised mismanagement as an independent ground to maintain" the breach-of-the-implied-

state" point, the judge cited <u>Amirsaleh</u> v. <u>Board of Trade of City of New York, Inc.</u>, No. 2822-CC, 2009 WL 3756700, at *5 (Del. Ch. Nov. 9, 2009).

2. The judge also said that even if he had not excluded "the damages calculation" under Civil Rule 37(c), the missing-inventory part of the breach-of-contract claim would still fail because an affidavit submitted by defendants' expert — the "Parent affidavit" — stated that the rival expert hired by Old K's had used the wrong data in coming up with the missing-inventory thesis. The judge added that the "failure" of counsel for Old K's "to acknowledge a genuine dispute of material fact in the face of my . . . warning . . . represent[ed] conduct descending to the level of a violation of [Civil Rule] 11(b)." And the judge criticized Old K's for citing no "case law that establishes that [its] evidence is superior to [d]efendants' evidence as a matter of law."

3. Finally, as for the liquidating-distribution piece of the breach-of-contract claim, the judge ruled that while Old K's "counsel were no doubt frustrated by confusing financial

_____

covenant claim "in its opposition" to defendants' first summary-judgment motion. But the judge said in his sanctions decision that he did "not consider whether this alone is a basis for sanctions because [p]laintiff's argument in favor of summary judgment" on the mismanagement issue was "legally unreasonable."

documents and insufficient documentary explanation[,] . . . lack of clarity is a reason to ask more questions during discovery" — "not a reason to move for summary judgment." For easy reference, we label these (unimaginatively) as "ruling #1," "ruling #2," and "ruling #3."

The parties battle hard over the correctness of the judge's sanctions decision, unsurprisingly. And we will get to their arguments in a minute, right after a very brief word about the standard of review.

**Standard of Review**

We review the judge's Civil-Rule-11-sanctions order for abuse of discretion, a deferential standard. See, e.g., Protective Life Ins. Co. v. Dignity Viatical Settlement Partners, L.P., 171 F.3d 52, 56, 57 (1st Cir. 1999). An abuse of discretion occurs when a judge makes "a mistake of law" or "a clearly erroneous finding of fact." Young v. City of Providence ex rel. Napolitano, 404 F.3d 33, 38 (1st Cir. 2005); see also Obert v. Republic W. Ins. Co., 398 F.3d 138, 143 (1st Cir. 2005). Because sanctions of this sort can chill counsel's creativity and devastate their professional reputations, we cannot emphasize enough that the abuse-of-discretion standard hardly means that we must affirm every discretionary decision that comes our way — review under this rubric still involves review, to state the obvious (because

sometimes it's helpful to state the obvious), and deference should not be confused with total capitulation. See Protective Life Ins. Co., 171 F.3d at 56; Dopp v. Pritzker, 38 F.3d 1239, 1253 (1st Cir. 1994).

**Analysis**

(a)
*Parties' Basic Positions*

Old K's starts by arguing that because defendants had asked for sanctions against its counsel, the imposition of sanctions against Old K's *itself* violated "due process." As for its other arguments, this is all that need be said: On the mismanagement issue — ruling #1 — Old K's believes that the judge stumbled because (to quote its brief, which cites to Nemec) proving a breach of "[t]he implied duty to exercise discretion in accordance with the reasonable expectation of the parties is breached only by the violation of the reasonable expectation of the parties" — a culpable state of mind "is not required." On the missing-inventory issue — ruling #2 — Old K's contends that the judge slipped because it reasonably believed that the Parent "affidavit lacked foundation" and "was impeached" by other evidence. And on the liquidating-distribution issue — ruling #3 — Old K's asserts that the judge erred because "[t]he LLC Agreement required" that defendants hand over the financial papers, sans "discovery or deposition questions." Also, writes Old K's,

- 42 -

defendants had to — but did not — produce the needed papers in response to discovery requests:  if documents "are not . . . provided, the resulting discrepancy with the contract and discovery obligations allows summary judgment as a remedy."  Adding this all together, Old K's proclaims that its summary-judgment motion was legally tenable and thus not sanctionable.

Conceding that they directed their sanctions motion "solely" at counsel for Old K's, defendants respond that at most we should reverse and remand so that the judge can modify the order to run only against counsel for Old K's.  But defendants then add — in support of rulings #1, #2, and #3 — that the judge committed no other errors.  And that is so, the theory goes, because Old K's and its lawyers "had been expressly warned" by the judge "that they faced [Civil] Rule 11 sanctions if they filed a cross-motion for summary judgment that was destined to fail" — and they went ahead and filed one anyway, wasting everyone's time by penning a motion peppered with disputed issues of material fact.

(b)
*Legal Primer*

Civil Rule 11 requires that a motion filer "certif[y] that to the best of the [filer]'s knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the filing does not offend the rule's commands, two of which are relevant here:  the filing's "legal contentions"

must be "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," and the filing's "factual contentions" must "have evidentiary support" or a "likely" prospect of it.  See Fed. R. Civ. P. 11(b)(2)-(3).[13]  Whether a filer breached these duties "depends on the objective reasonableness of the [filer's] conduct under the totality of the circumstances."  See Navarro-Ayala v. Nunez, 968 F.2d 1421, 1425 (1st Cir. 1992); accord CQ Int'l Co. v. Rochem Int'l, Inc., USA, 659 F.3d 53, 62 (1st Cir. 2011).  Though

_____

[13] The entire provision reads as follows:

(b) Representations to the Court.  By presenting to the court a pleading, written motion, or other paper — whether by signing, filing, submitting, or later advocating it — an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

- 44 -

we hold filers "to standards of due diligence and objective reasonableness," we do not require "perfect research or utter prescience." Me. Audubon Soc'y v. Purslow, 907 F.2d 265, 268 (1st Cir. 1990).

And make no mistake: Civil Rule 11 "is not a strict liability provision" — a filer "must, at the very least, be culpably careless" to get whacked with a sanctions order. See Young, 404 F.3d at 39; see also Roger Edwards, LLC v. Fiddes & Son Ltd., 437 F.3d 140, 142 (1st Cir. 2006). Also, because "what is 'existing law' or a 'nonfrivolous' argument for extension is sometimes debatable," even a "poorly supported and sure to fail" motion may not be sanctionable:

> Counsel every day file motions that are hopeless, just as they make hopeless objections in trials and hopeless arguments to the judge. Perhaps a court could sanction counsel under Rule 11 for many such hopeless motions, but doing so routinely would tie courts and counsel in knots.

Obert, 398 F.3d at 146 (emphasis omitted); accord Protective Life Ins. Co., 171 F.3d at 58. So to get tagged with sanctions, it is not enough that the filer's "claim lacked merit" — it must be "so *plainly unmeritorious* as to warrant the imposition of sanctions." Protective Life Ins. Co., 171 F.3d at 58 (emphasis added) (noting that the simple "fact that a claim ultimately proves unavailing, without more, cannot support the imposition of Rule 11 sanctions" and adding that "[i]f every failed legal argument were

- 45 -

sanctionable, sanctions would be the rule rather than the exception").

(c)
*Our Take*

Having carefully considered the matter — and with great respect for the differing view of the very able district judge, who had to deal with this hotly-contested case for nearly a decade — we must vacate the sanctions order and remand for further proceedings (assuming defendants still want sanctions).

Our reasons are simple. For starters — and as both sides agree — the judge erred when he ordered sanctions against Old K's rather than against its attorneys. See Fed. R. Civ. P. 11(c)(5)(A) (proclaiming that "[t]he court must not impose a monetary sanction . . . against a represented party for violating Rule 11(b)(2)"). Turning next to ruling #1 — that the implied-covenant claim failed because Old K's did not prove that defendants acted with "a culpable mental state" — we conclude that the judge based his decision on a misunderstanding of the relevant law. While "[t]here are references in Delaware case law to the implied covenant turning on the breaching party having a culpable mental state," cases post-Amirsaleh recognize that "[t]he elements of an implied covenant claim remain those of a breach of contract claim" — "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff"

- 46 -

— and that "[p]roving a breach of contract claim does not" (repeat, does *not*) "depend on the breaching party's mental state." ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC, 50 A.3d 434, 442, 444 (Del. Ch. 2012) (internal quotations omitted), rev'd on other grounds, 68 A.3d 665 (Del. 2013).[14] Old K's actually made that very point in its opening brief, without being contradicted by defendants in their brief. Anyhow, by using the culpable-mental-state concept as a building block in his sanction analysis, the judge committed an error of law, thus abusing his discretion. See CQ Int'l Co., 659 F.3d at 59. And because we cannot tell how this error on ruling #1 affected his overall sanctions decision, we vacate the judge's sanctions order. Assuming defendants still want Civil-Rule-11 sanctions, the judge on remand will have the chance to exercise his discretion with an improved understanding of Delaware law. And given our holding, we have no need to reach the parties' arguments concerning ruling #2 and ruling #3 — they can take these matters up with the judge on remand, if necessary. See generally Sharfarz v. Goguen (In re

---

[14] For other cases saying the same thing, please check out NAMA Holdings, LLC v. Related WMC LLC, C.A. No. 7934-VCL, 2014 WL 6436647, at *17 (Del. Ch. Nov. 17, 2014); Allen v. El Paso Pipeline GP Co., C.A. No. 7520-VCL, 2014 WL 2819005, at *10 (Del. Ch. June 20, 2014); In re El Paso Pipeline Partners, L.P. Derivative Litig., C.A. No. 7141-VCL, 2014 WL 2768782, at *17 (Del. Ch. June 12, 2014).

<u>Goguen)</u>, 691 F.3d 62, 72 (1st Cir. 2012) (noting that "we have a fair amount of elbow room 'to shape a remand in the interests of justice'" (quoting <u>United States</u> v. <u>Merric</u>, 166 F.3d 406, 412 (1st Cir. 1999))).[15]

---

[15] In its opening brief, Old K's makes a one-sentence argument that we should remand to a different judge because "his impartiality 'might reasonably be questioned,'" since he had hit it with sanctions and had taken a long time to rule on the cross-motions for summary judgment. <u>See generally</u> 28 U.S.C. § 455(a) (declaring that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned"). But "reassignment to another judge on remand is for the rare and exceptional case." <u>Candelario Del Moral</u> v. <u>UBS Fin. Servs. Inc.</u>, 699 F.3d 93, 106 (1st Cir. 2012). And having thought about the matter, we do not think the situation here can be described as "rare and exceptional." <u>See</u> <u>id.</u> (explaining that opinions that a judge "form[s] in slogging through cases typically do not provide 'a sound basis either for required recusal or for directing that a different judge be assigned on remand'" (quoting <u>Hull</u> v. <u>Municipality of San Juan</u>, 356 F.3d 98, 104 (1st Cir. 2004))); <u>see also</u> <u>Liteky</u> v. <u>United States</u>, 510 U.S. 540, 555 (1994) (noting that judicial remarks "critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge"); <u>Cohesive Techs., Inc.</u> v. <u>Waters Corp.</u>, 543 F.3d 1351, 1374-75 (Fed. Cir. 2008) (applying First Circuit law and holding that a six-year delay in issuing a ruling — while "unreasonable and unacceptable" — did not justify remand to a different judge, because nothing suggested that the judge "would have substantial difficulty putting his previously expressed views or findings out of his mind" and because "reassignment would necessarily entail a great deal of waste and duplication of effort"). Put bluntly, because we see no indication that the judge "cannot reapproach the case with an open mind," Old K's "cannot get the remedy it seeks." <u>Candelario Del Moral</u>, 699 F.3d at 107.

**CONCLUSION**

Having slogged through case's twists and turns and picked through the parties' inventory of issues, we *affirm* the grants of summary judgment to defendants but *vacate* the decision to impose sanctions under Civil Rule 11 and *remand* for proceedings consistent with this opinion (again, that's assuming defendants still want sanctions).

No costs to either side on this appeal.